**Elizabeth M.S. HIXSON,
Appellant/Cross–
Appellee,**

v.

**Michael S. SARKESIAN, Appellee/Cross–
Appellant.**

**Nos. S–10316, S–10335.**

Supreme Court of Alaska.

March 28, 2003.

---

Elizabeth M.S. Hixson, pro se.

Keith B. Levy, Law Office of Keith B. Levy, Juneau, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

The superior court granted Michael S. Sarkesian's motion to modify child support. Elizabeth M.S. Hixson argues that the superior court erred in calculating Michael's income and that the superior court should have enforced an earlier settlement agreement for child support above that required by Alaska Civil Rule 90.3. Michael S. Sarkesian filed a cross-appeal claiming that his alimony obligations to his former wife terminated when she remarried, that he was not obligated to pay certain of the children's unreimbursed medical expenses, and that he should have been awarded attorney's fees by the superior court. Although we affirm the superior court's decision to modify the child support award, we reverse the superior court's imposition of Rule 90.3's income cap and remand to the superior court to award child support

based on Sarkesian's actual reduced income. We affirm the superior court's decision in all other respects.

## II. FACTS AND PROCEEDINGS

Elizabeth M.S. Hixson and Michael S. Sarkesian divorced on May 23, 1991; they had two children during their marriage.[1] Sarkesian lived in Switzerland at the time of the divorce and continues to live there. In June 1992 Superior Court Judge Larry C. Zervos, who presided over the divorce trial, ordered Sarkesian to pay $2,550.80 per month in child support. The superior court also ordered Sarkesian to purchase health insurance for the children, to pay their unreimbursed medical expenses, and to pay for their transportation costs associated with visitations. Deducting these expenses from Sarkesian's ordered child support reduced his monthly child support payment to $2,138.80. Sarkesian was allowed to claim the children on his future tax returns. Sarkesian was also ordered to pay rehabilitative alimony of $1,000 per month for thirty months to "allow [Hixson] the time and opportunity to finish her degree and prepare to start work."

Both sides appealed the child support, spousal support, and property distribution awards. In a memorandum opinion and judgment, we remanded for an adjustment of Sarkesian's income, a reduction in the property distribution to Sarkesian, and justification of the imposition of the income cap and the amount of the alimony award.[2] Other minor matters not relevant to the present appeal were also addressed.

Upon remand, the parties reached a settlement agreement rather than pursue another trial. The agreement incorporated most aspects of the prior superior court decision and calculated the existing balances that Sarkesian owed to Hixson. The settlement document stated that it was "[t]he expressed intent of both parties ... to end this litigation, to stop the possibility of further appeals and to prevent the expenditure of additional attorney's fees."

On August 3, 2000, Sarkesian filed a motion to modify child support based upon a decline in his income. The principal ground claimed for the decline in income was the assertion that he had changed employers and no longer received bonuses. Sarkesian contended that his income had declined by more than the fifteen percent threshold listed in Civil Rule 90.3(h)(1).[3] Sarkesian further claimed that the law had been amended to allow for a seventy-five percent reduction in child support, as opposed to the fifty percent allowable reduction at the time of the initial divorce settlement, for visitation longer than twenty-seven consecutive days[4] and that the children's travel expenses should be modified because of the reduction in his income.[5]

The superior court, Judge Zervos again presiding, entered judgment on June 18, 2001. Judge Zervos found there to be a material change in circumstances for Sarkesian because the "substantial" decline in the value of the Swiss franc as compared to the American dollar "is sufficient to make a prima facie case of a 15 percent decline in income." Judge Zervos consequently adjusted the exchange rate by averaging the rate in use on the date of the trial and the rate Sarkesian used in his 2000 tax return. This resulted in a decrease of more than fifteen percent in Sarkesian's income. Because this decrease exceeded the requirements of Civil Rule 90.3(h)(1), Judge Zervos concluded that Sarkesian had established the material change in circumstances necessary for an

1. The children are Michael Jr., born September 1985 and Brittany, born May 1987. Both children are still minors.

2. We ordered the superior court to undertake this analysis according to the standards for rehabilitative alimony. If these standards were not met, the superior court was permitted to consider the alimony as reorientation alimony.

3. The rule provides in relevant part: "A final child support award may be modified upon a showing of a material change of circumstances as provided by state law. A material change of circumstances will be presumed if support as calculated under this rule is more than 15 percent greater or less than the outstanding support order."

4. See Alaska R. Civ. P. 90.3(a)(3).

5. See Alaska R. Civ. P. 90.3(g).

adjustment in child support payments. Judge Zervos subsequently imposed the $84,000 income cap contained in Civil Rule 90.3(c)(2) to the calculation of Sarkesian's child support obligations.

Judge Zervos also addressed a variety of other issues. Judge Zervos allowed Sarkesian to deduct 1,500 Swiss francs (CHF) of a 2,000 CHF housing allowance from income because Sarkesian used one-third of the house, which had a monthly rent of 4,500 CHF, as office space. Judge Zervos found that a disputed car lease was no longer relevant to calculating Sarkesian's income. Judge Zervos further ordered that Hixson list her children under her employer's health insurance, though Sarkesian was to pay one-half of the cost of covering the children if this would result in additional costs to Hixson. Sarkesian was ordered to pay four-fifths of the unreimbursed medical expenses of the children. Transportation costs were adjusted due to the children now being able to travel alone. Judge Zervos also ordered that Sarkesian's child support obligations be reduced by seventy-five percent during periods of extended visitation.

On appeal, Hixson challenges the calculation of Sarkesian's income, the constitutionality of the income cap, the re-litigation of child support following a settlement agreement designed to end litigation regarding the divorce, and the alleged requirement that she bear the burden of proving the children had special needs necessitating the waiver of the income cap. On cross-appeal, Sarkesian argues that his alimony obligation to Hixson ceased upon her remarriage, that he should not be required to pay for the children's orthodontia and contact lenses, that he should not have been required to pay four-fifths of the children's unreimbursed medical expenses, and that the trial court should have

awarded him attorney's fees and costs as the prevailing party.

## III. STANDARD OF REVIEW

 Modifications of child support are reviewed under an abuse of discretion standard.[6] An abuse of discretion exists where "based on the record as a whole this court is left with a 'definite and firm conviction that a mistake has been made.' "[7] Questions of law are reviewed de novo.[8] Questions of constitutional law are also reviewed de novo.[9] The interpretation of an agreement between two parties is a question of law to which we apply our independent judgment.[10] Awards of attorney's fees in modification of child support cases are reviewed for an abuse of discretion.[11] Attorney's fees awarded pursuant to Civil Rule 82(b)(1) are presumptively correct.[12]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Calculating Sarkesian's Income.

 Hixson alleges that the superior court erred in calculating Sarkesian's income because it improperly accounted for the housing and auto allowances provided by his employer. Hixson contends that only one room of the house was used for office space and that even then it was only used for ten days a month. Hixson argues that Sarkesian's employer could have rented an office elsewhere and that thus Sarkesian was receiving a benefit that was not a business expense. Hixson further claims that Sarkesian received his excessive allowances because he is the only board member with sole signatory powers and can therefore manipulate the business affairs of the company to his benefit. Hixson also contends that Sarkesian manipulated an auto lease for a BMW, portraying it as a

6. *Flannery v. Flannery*, 950 P.2d 126, 129 (Alaska 1998).

7. *Richmond v. Richmond*, 779 P.2d 1211, 1216 (Alaska 1989) (citation omitted).

8. *State, Dep't of Revenue, Child Support Enforcement Div., ex rel. Hawthorne v. Rios*, 938 P.2d 1013, 1015 (Alaska 1997).

9. *Brown v. State, Dep't of Admin., Div. of Motor Vehicles*, 20 P.3d 586, 587 (Alaska 2001).

10. *Flannery*, 950 P.2d at 129.

11. *Byars v. Byars*, 945 P.2d 792, 795 (Alaska 1997).

12. *Id.*

company car when it was actually for his own personal use.

Hixson in essence is attempting to reargue on appeal her case below. However, Judge Zervos did not abuse his discretion in excluding the car from Sarkesian's income and in allowing Sarkesian to deduct a portion of his housing allowance from his income. Commentary III.B to Civil Rule 90.3 states that "[e]xpense reimbursements and in-kind payments such as use of a company car, free housing or reimbursed meals should be included as income if the amount is significant and reduces living expenses." Sarkesian presented testimony at trial that the disputed reimbursements did not reduce his living expenses. He testified that the automobile lease had been terminated and that the vehicle was not subsequently replaced. Sarkesian also testified that one of the levels of his house is used exclusively as a business office. The level has its own separate entrance and is equipped with standard business equipment. This testimony supports Judge Zervos's conclusion that the auto lease was no longer relevant to calculating Sarkesian's income and that he could deduct one-third of the monthly rent of his house from his housing allowance. While it may be possible to interpret matters as Hixson suggests, it is not clear that Judge Zervos has made a mistake in his factual determinations. His ruling is therefore affirmed.

### B. The Superior Court Erred by Reinstating the Income Cap Despite the Settlement Agreement to the Contrary.

■ In the settlement agreement reached following the remand of their divorce case after the first appeal, the parties agreed that Sarkesian would make monthly child support payments in excess of what would have been required had Rule 90.3's income cap been imposed. The settlement agreement incorporated by reference the superior court's June 1, 1992 findings of fact and conclusions of law, which explicitly waived the cap be-

cause of the lifestyle advantages the children would have enjoyed had the family stayed together. In their settlement agreement, the parties further "expressed [their] intent ... to end this litigation, to stop the possibility of further appeals and to prevent the expenditure of additional attorney's fees." Hixson argues that because Sarkesian entered into a settlement of child support, agreeing to an award above that required by Civil Rule 90.3, he has given up his right to seek modification of the child support award.

■ In *Flannery v. Flannery*, we held that an agreement to waive the income cap for calculation of child support may later be modified due to a material change in circumstances.[13] But the change in circumstances must not be anticipated at the time the agreement is signed, and the drop in income must appear to be permanent, not temporary.[14] Judge Zervos, after finding more than a fifteen percent reduction in Sarkesian's income, applied Rule 90.3's $84,000 income cap as the basis of Sarkesian's child support obligation. Judge Zervos found there to be a material change in circumstances due to the decline in Sarkesian's income.

Judge Zervos distinguished the present case from *Flannery*, where we warned against allowing obligors to use a motion for modification of child support as a "back door" by which to circumvent an earlier agreement to waive the income cap.[15] First, Judge Zervos concluded that in contrast to *Flannery*, where waiver of the income cap had been a part of the initial divorce settlement,[16] Sarkesian here "acquiesced to the amount of child support only after extensive litigation, after the court had ordered the cap to be waived, and when the only issue remaining was whether the children's needs justified the waiver." Second, Judge Zervos reasoned that the adjustment to Sarkesian's income brought him close to the income cap and that "the amount in issue, if the cap is breached, is de minimus."

---

13. 950 P.2d at 131.

14. *Id.* at 132 (citing *Curley v. Curley*, 588 P.2d 289, 291–92 (Alaska 1979)).

15. 950 P.2d at 134.

16. *Id.* at 128.

▆▆▆ We reject the superior court's first line of reasoning and reiterate our holding in *Flannery* that modifications of child support cannot be used as a means to circumvent an agreement to waive the income cap.[17] Because they are, in essence, contracts, settlement agreements freely entered into do not lose their binding nature because extraneous circumstances exist at the time.[18] It therefore does not matter that Sarkesian signed the settlement agreement "only after extensive litigation." Sarkesian still signed the agreement with full knowledge of its contents.[19] Sarkesian presumably believed that the agreement, including the waiver of the income cap, was in his best interests and that he was being compensated by not having to face further litigation and its inherent risks.

▆▆▆ Moreover, although the superior court recognized that Sarkesian's adjusted annual income of $85,015.41 is quite close to the income cap of $84,000, this does not justify reduction of child support to an award based on the income cap. Our concern in *Flannery* was that the "15% rule" not be used as a means by which a parent who, because of a settlement agreement, pays child support well above that required by the income cap, could turn around and reduce the child support payments to the amount derived from the income cap even though the parent's ability to pay child support above that required by the income cap remains intact.[20] In other words, in the context of an agreement to waive the income cap and pay

child support in excess of Rule 90.3's requirement, the mere fact of a fifteen percent change in income does not necessarily constitute a change of circumstances entitling the obligor to a reduction in support based on the income cap.[21] As we stated in *Flannery*,

> [w]e think that in context of an agreement like the Flannerys', the 15% rule can be used to demonstrate materiality, but the comparison cannot be between the amounts Michael agreed to pay and what the rule minimally requires.[22]

Because Sarkesian's reduction in income, while exceeding fifteen percent, does not reduce his income to the level of the income cap, applying that cap to Sarkesian is inconsistent with our decision in *Flannery*. As we suggested in *Flannery*, where an obligor's income is significantly reduced but still exceeds the cap, "multiplying the obligor's uncapped changed income by the pertinent percentage yields the support the parties presumptively would have specified had that been the obligor's income when they entered into their agreement." [23] Thus, the child support award should have been based on Sarkesian's actual reduced income of $85,015.41, not the income cap of $84,000. And although the resulting difference in child support is, according to the superior court, only $22.84 a month, we cannot agree that this amount is de minimus or in itself justifies application of Rule 90.3's income cap.[24]

---

17. *See* 950 P.2d at 134.

18. *See* RESTATEMENT (SECOND) OF CONTRACTS, ch. 8, Introductory Note (1981) ("In general, parties may contract as they wish, and courts will enforce their agreements without passing on their substance.... The principle of freedom of contract is itself rooted in the notion that it is in the public interest to recognize that individuals have broad powers to order their own affairs by making legally enforceable promises.").

19. The superior court stated that it would treat the settlement order "the same as if [it were] reached upon agreement of the parties as opposed to rulings rendered by the court."

20. 950 P.2d at 132 ("If the presumption [of the applicability of the "15% rule"] were available in such a case, an obligor who agreed to pay child

support more than 15% greater than the support required by Rule 90.3 could seek a modification immediately after signing the agreement.").

21. *Id.* ("As we stated in *Bunn*, ' "[t]he 15% rule" is a rule of materiality, not a definition of what constitutes a change of circumstances. There must be a change of circumstances, either factual or legal.' ") (quoting *Bunn v. House,* 934 P.2d 753, 758 (Alaska 1997)).

22. *Id.*

23. *Id.*

24. Because we hold that Sarkesian's child support should be based on his actual reduced income which exceeds the income cap, we need not address Hixson's argument that the income cap is unconstitutional.

## C. Sarkesian's Alimony Obligation Did Not Automatically Terminate When Hixson Remarried.

The trial court ordered Sarkesian to pay $1,000 per month of rehabilitative alimony for a period of thirty months. This order was adopted in the settlement agreement, which required Sarkesian to pay the same $1,000 per month for the remaining thirteen of the original thirty months.[25] When Hixson remarried in July 1995, Sarkesian ceased paying the remaining nine alimony payments, alleging that Hixson's marriage eliminated his obligation to pay. Sarkesian filed a motion to clarify the status of his alimony obligations on December 18, 2000. Judge Zervos reiterated that the alimony "has always been" rehabilitative alimony and accordingly reaffirmed Sarkesian's obligation to make the remaining nine monthly payments despite Hixson's remarriage.[26]

To support his claim that he did not need to pay Hixson alimony when she remarried, Sarkesian points to the holding in *Voyles v. Voyles* that "by the act of remarriage, the formerly dependent spouse elects to abandon the alimony provision established at the termination of the spouse's preceding marriage."[27] Reorientation alimony, which we have stated is "appropriate to allow the requesting spouse an opportunity to adjust to the changed financial circumstances accompanying a divorce," can at the discretion of the trial court terminate upon remarriage.[28] However, in *Musgrove v. Musgrove*, this court held that remarriage does not automatically terminate rehabilitative alimony.[29] Rather, rehabilitative alimony, which "is awarded for a short duration and a specific purpose 'limited to job training or other means directly related to entry or advancement within the work force,'"[30] can be modified "only when there is a material and substantial change in circumstances related to its purpose."[31] Sarkesian presented no argument that Hixson ceased upon remarriage to engage in those rehabilitative activities for which alimony was originally granted. Instead, Sarkesian argues that the settlement agreement effectively provides for reorientation alimony instead of rehabilitative alimony because it removes the requirement that Hixson obtain any job training or education.

This characterization is not entirely correct. The settlement agreement upon which Sarkesian's argument is based only states that payments to Hixson will be made "without any further argument about, or monitoring of, [Hixson's] schooling by the defendant or his counsel." It does not state that she need not obtain education or job training. The superior court at the time labeled this spousal support as rehabilitative alimony. Furthermore, in response to Sarkesian's motion to clarify his alimony obligations, the superior court determined that the alimony had always been and remained rehabilitative alimony. In reaching this conclusion, the superior court rejected the precise argument that Sarkesian is making now. As we have stated previously: "The superior court has wide discretion in making alimony determinations. We will not interfere with such determinations unless the superior court abused its discretion."[32] There is no abuse of discretion here. Consequently, we affirm Judge Zervos's decision to consider the alimony as rehabilitative and to require that Sarkesian pay it despite Hixson's remarriage.

## D. Sarkesian Is Required To Pay Unreimbursed Medical Costs.

### 1. Braces and contact lenses

In the initial divorce decree, Sarkesian was ordered to pay "the entire deduct-

---

**25.** Of this amount, four months were in arrearage and the other nine months remained to pass.

**26.** The superior court on August 7, 1992 had entered an order stating that the alimony award could be considered reorientation alimony as opposed to rehabilitative alimony.

**27.** 644 P.2d 847, 849 (Alaska 1982).

**28.** *Edelman v. Edelman*, 3 P.3d 348, 358 (Alaska 2000).

**29.** 821 P.2d 1366, 1370 (Alaska 1991).

**30.** *Id.* at 1369 (quoting *Richmond v. Richmond*, 779 P.2d 1211, 1215 (Alaska 1989)).

**31.** *Musgrove*, 821 P.2d at 1370.

**32.** *Edelman*, 3 P.3d at 358 (citations omitted).

ible and all other costs not covered by the [children's health care] policy." This was affirmed by the later settlement agreement, which provided that "[a]ll provisions of [the June 1, 1992 order] relating to child support issues shall remain in full force and effect." Judge Zervos, in the June 18, 2001 superior court opinion from which this appeal originates, examined the medical bills that Hixson provided relating to the children's orthodontic treatment and ordered Sarkesian to reimburse her for the total amount of the bills.

Sarkesian claims that because he was paying child support in excess of the income cap, he should not have been required to pay for unreimbursed medical expenses since those costs should have been included in calculating the economic needs of the children for which the higher payments were justified.[33] However, shifting these expenses to Sarkesian was part of the settlement agreed to by Sarkesian. He can and does argue that the cost shifting for future unreimbursed medical expenses should be changed, but it appears clear that absent such a modification, costs such as contact lenses and braces are something Sarkesian agreed not to litigate when he signed the settlement agreement. Sarkesian is therefore liable to Hixson for these expenses.

### 2. Future unreimbursed medical expenses

 In his June 18, 2001 order, Judge Zervos ordered that Sarkesian pay four-fifths of all future unreimbursed medical expenses, with the other fifth to be paid by Hixson. Sarkesian contends that this disparity is unjustified given Hixson's employment and her recent marriage. Sarkesian argues that at the very least Civil Rule 90.3(d)(2) requires that the first $5,000 of unreimbursed medical expenses be split evenly.[34]

The superior court found that Sarkesian's yearly income is $85,015.41. By Sarkesian's own admission, Hixson can be expected to earn only about $22,000 per year. Sarkesian thus earns almost four times as much as Hixson and could reasonably be expected to contribute four-fifths of the unreimbursed medical costs, as the court found. Sarkesian's interpretation of Civil Rule 90.3(d)(2) is also incorrect. The first sentence states that health care costs should be shared equally unless the court finds "good cause" to allocate them otherwise. In the present case, the superior court did find reason to allocate these costs disproportionately, namely the "parties' relative incomes." This was not an abuse of discretion. The last sentence of Civil Rule 90.3(d)(2) does not require, as Sarkesian asserts, that only those unreimbursed medical expenses exceeding $5,000 be allocated according to the financial circumstances of the parents. Rather, it requires that the superior court allocate those expenses exceeding $5,000 according to ability to pay regardless of how the court allocated the first $5,000 of expenses. In other words, this sentence does not negate the ability of the superior court to deviate from an equal distribution of unreimbursed medical costs if it finds good cause to do so.

### E. The Superior Court Did Not Err In Denying Sarkesian Attorney's Fees.

 Sarkesian argues that the superior court should have awarded him attorney's fees because he prevailed on the central issue of the modification of his child support obligation. The standard of review for awards of attorney's fees is abuse of discretion[35] and Judge Zervos did not abuse his discretion. Judge Zervos initially declined to award Sarkesian attorney's fees because both sides had prevailed on significant issues

---

33. This court has previously held that contact lenses and orthodontia are reasonable medical expenses. *Cedergreen v. Cedergreen*, 811 P.2d 784, 788–89 (Alaska 1991).

34. Alaska Civil Rule 90.3(d)(2) provides:
 The court shall allocate equally between the parties the cost of reasonable health care expenses not covered by insurance unless the court orders otherwise for good cause. A party shall reimburse the other party for his or her share of the uncovered expenses within 30

days of receipt of the bill for the health care, payment verification, and, if applicable, a health insurance statement indicating what portion of the cost is uncovered. Reasonable, uncovered expenses exceeding $5,000 in a calendar year will be allocated based on the parties' relative financial circumstances when the expenses occur.

35. *Byars v. Byars*, 945 P.2d 792, 795 (Alaska 1997).

and because Sarkesian's income was greater than Hixson's. Judge Zervos observed that while Sarkesian prevailed on reducing child support, re-imposing the income cap, and reducing his child support obligations during extended visitations, Hixson prevailed on transportation costs, unreimbursed medical costs, and in adjusting Sarkesian's income upward from what he himself asserted. In a subsequent order reconsidering attorney's fees, Judge Zervos recognized that the respective incomes of the parties should not matter, but added that Sarkesian was being denied attorney's fees due to "past dishonesty and sharp litigation practices" [36] which increased the effort that Hixson needed to exert to defend herself. Judge Zervos therefore presented justifiable reasons for declining to award attorney's fees. Because of the difficulties created by Sarkesian during the litigation and because both parties prevailed on significant issues, it was not an abuse of discretion to deny attorney's fees.

## V. CONCLUSION

The superior court's decision to impose Rule 90.3's income cap is REVERSED and the case REMANDED to the superior court to award child support based on Sarkesian's reduced income of $85,015.41, an amount that still exceeds the cap. All other decisions of Judge Zervos as they relate to these divorce proceedings are AFFIRMED.

CARPENETI, Justice, not participating.

---

**36.** The superior court provided several examples of Sarkesian's questionable litigation tactics:

> In the prior case, Mr. Sarkes[ia]n opened an account without Ms. Hixson's knowledge even before the parties[ ] separated. He diverted marital money into this account. He was paid substantial bonuses but did not disclose those bonuses until well into the discovery stages of the litigation. Even during the trial it was disclosed that he hoarded large sums of cash in his home. Mr. Sarkesian argues that the prior dishonesty cannot be used as a basis to deny attorney's fees because the result wold be to effectively eliminate Civil Rule 82 in all cases. But this is not correct.
>
> Because of Mr. Sarkesian's past dishonesty and sharp litigation practices, Ms. Hixson has

been forced to question every assertion made by Mr. Sarkesian in this child support litigation. Not just because she wanted to defeat Mr. Sarkesian's motion, but to insure that he was not doing what he has done in the past—unfairly hide assets or income and mislead her. She was forced to spend more time and energy and more resources for investigation because she cannot trust Mr. Sarkesian. It is obvious that Ms. Hixson did not treat this motion like most child support modification cases are handled. But based on experience, she could not afford to take Mr. Sarkesian at his word. Even recently, as the court has noted before, Mr. Sarkesian's transaction with the BMW is, at the very least, peculiar and suspicious.